Filed 4/9/26  P. v. McDarment CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARWIN DEAN MCDARMENT,<br><br>    Defendant and Appellant. | F090043<br><br>(Super. Ct. No. VCF257564)<br><br>**OPINION** |

**THE COURT**<sup>*</sup>

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Scott N. Cameron, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

<sup>*</sup>        Before Hill, P. J., Detjen, J. and Franson, J.

## INTRODUCTION

Appellant and defendant Marwin Dean McDarment (McDarment) was convicted of multiple offenses including two counts of premeditated attempted murder of peace officers. He was originally sentenced to an aggregate term of 90 years plus 126 years to life. In his direct appeal, this court affirmed the convictions, but remanded for resentencing because some of the prior conviction findings were not supported by substantial evidence. On remand, McDarment was resentenced to 82 years plus 60 years to life.

On appeal from the resentencing, appellate counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) McDarment did not file a supplemental brief on his own behalf. We affirm.

## FACTS[1]

"While on parole, McDarment had a parole violation hearing a few weeks before September 9, 2011.[2] Due to a mistake made at the disposition phase of that hearing, McDarment was given credit for time served and released from custody even though, under Board of Parole Hearing 'policy', he was supposed to receive a set amount of time. As a result, a new disposition hearing was set for after September 9, at which time it was possible McDarment could be taken back into custody. McDarment was informed that he had to come back for another disposition hearing due to the hearing officer's mistake.

"McDarment was on an ankle monitor at the time of his release. Sometime on September 8, the monitor went dead. At the time, there was zero tolerance for failing to

---

[1] On January 27, 2026, this court granted McDarment's request for judicial notice of the nonconfidential record and our nonpublished opinion in *People v. McDarment* (Aug. 2, 2024, F085045) (*McDarment I*), his direct appeal. The following factual statement is taken from that opinion.

[2] "All further references to dates are to 2011, unless otherwise stated." (*McDarment I*, *supra*, F085045.)

charge the device at least one hour every 12 hours, regardless of whether the device went dead or not. The monitor would warn that its battery was low through vibrations every 10 minutes.

"On September 9, McDarment had several encounters with [W.J.], [D.B.], and other members of their family on the Tule Indian Reservation in Tulare County, during which he cussed and directed racial slurs at them. [W.J.] and [D.B.] both knew McDarment and had not previously had problems with him.

"The encounters culminated in McDarment coming to [W.J.]'s house that afternoon. McDarment was driving his red-burgundy … pickup. At [W.J.]'s house, McDarment pulled out a black revolver and pointed it at [W.J.]'s brothers.

"[W.J.]'s mother yelled at McDarment that she was on the phone with police, even though she was in fact on the phone with a tribal council member. McDarment drove off.

"Around 3:30 p.m. that day, multiple law enforcement units responded to the call of a disturbance with weapons at the reservation. Tulare County Sheriff's Lieutenant Christopher Wenzinger and Deputy Brad McLean were among the responding units.

"Deputy McLean was driving behind Lieutenant Wenzinger on Reservation Road when the two encountered McDarment driving his pickup in the opposite direction. Lieutenant Wenzinger described McDarment as having a 'smirk or a smile' on his face. The officers made a U-turn and followed McDarment. McClean activated his overhead lights to make a stop.

"McDarment came to a stop at a turnout, and McLean and Wenzinger pulled in behind McDarment. The officers began a 'felony' or 'high risk' stop, in which the driver is told to shut off the vehicle, throw the keys out of the car, place their hands outside the window, and then walk back to where the officers are.

"As McLean told McDarment to shut off the vehicle and show his hands, McDarment put his left hand outside the lowered window. When Deputy McLean again told McDarment to shut off the vehicle and put his hands outside the window,

3.

McDarment turned, put his right hand and a firearm outside the window, pointed the gun in the officer's direction and fired a shot.

"McLean dropped down for cover, causing Lieutenant Wenzinger to believe he had been shot. McLean then returned fire and attempted to inform dispatch that shots were fired. He then moved toward the rear passenger side of his vehicle, while Wenzinger moved to the rear driver's side of McLean's vehicle.

"The officers continued to tell McDarment to drop his gun and exit the vehicle. McLean estimated 30 to 40 seconds elapsed before McDarment again put his right hand out the window, pointed in the direction of the officers and fired another shot. Both officers returned fire. At one point, when Lieutenant Wenzinger attempted to converse with McDarment over the PA loudspeaker, McDarment responded, 'Fuck you, motherfucker.'

"While the officers waited for the arrival of more units, McClean conducted a 'tactical reload' and then covered Wenzinger while he went to the back of his vehicle to retrieve more ammunition. The officers returned fire 'every time' McDarment raised his gun.

"Tule River Tribal Police Patrol Officer Mark Hatch and Community Service Officer Sergio Sanchez were in Officer Hatch's patrol unit when they heard a report of shots fired. Hatch activated his light and accelerated. Hatch's patrol vehicle came around a bend and saw McDarment's vehicle with McLean and Wenzinger's vehicles behind it. Hatch saw two bullet holes in the windshield of McDarment's [pickup]. Hatch stopped near Wenzinger's vehicle. Hatch got out of his vehicle and told Service Officer Sanchez to take the vehicle down the road to block off traffic.

"Hatch went to the rear passenger corner of McLean's vehicle. McLean retrieved a shotgun from his patrol vehicle and, as he was racking a round, saw McDarment present his firearm and heard a gunshot. Hatch heard a loud bang and felt something pass

4.

by his head. Both McLean and Hatch returned fire. Hatch thought he heard another shot from the [pickup].

"At one point, Wenzinger told McDarment[,] ' "[N]obody's gotta die here. Throw the gun out, give up. Let's all go home.… But if you point that gun at me again, I'm going to shoot you." ' McDarment replied with something like, ' "You've already shot me." '

"McDarment eventually threw his gun out the window and then dropped to the ground outside the driver's side of his vehicle. McDarment was bloody, 'flailing' and 'angry', and continued to curse at the officers. McDarment had multiple gunshot wounds, first aid was administered and an ambulance called.

"McDarment's weapon was a .45-caliber single-action revolver. There were three fired casings and three live rounds in the cylinder of the revolver. A box of 16 rounds of .45-caliber ammunition was found under the driver's seat of the [pickup]. There were no spent casings connected with the revolver in or around the truck.

"Radio logs indicated that the 'first shots fired' call went out at 3:54 p.m., additional shots fired call went out at 3:58 p.m., and an in-custody call went out at 4:02 p.m." (*McDarment I*, *supra*, F085045.)

**Defense Evidence**

"McDarment testified that he was aware that he had to go back for a parole hearing because something had to be corrected, but he did not believe this meant he was going into custody. McDarment acknowledged that, while his ankle monitor was off on September 9, this had happened on numerous previous occasions as his battery would die faster than normal because of poor reception. McDarment claimed he had an understanding with his parole officer to take care of the battery issue at the end of his 10-hour work shifts.

"McDarment knew he was not supposed to have a firearm as a convicted felon, but all of his neighbors had guns—he lived out in the country, and they told him he

5.

should have one too. McDarment bought his gun from a neighbor and his uncle gave him ammunition. He acknowledged having the gun and ammunition in his truck on September 9.

"McDarment described the encounter, which occurred earlier that day, when [W.J.] and her brothers were 'chitchatting' on the road, blocking traffic, and he told them to get off the road. Later that day, the same group was smoking while in their car in the middle of the road, again blocking traffic. McDarment yelled at them. They yelled back and said that if McDarment wanted to fight, he should come to their house. When McDarment clocked out that day, [W.J.] threatened to file a complaint on McDarment for ' "talking shit" ' to her brothers, so McDarment decided to go to their house to talk to them. When he arrived, he could tell by the demeanor of the brothers that they were looking for a fight, so he showed them the gun, which was unloaded. The brothers scattered.

"McDarment then went to his uncle's house, where he stayed long enough to shoot six rounds, reloaded the gun, and then planned to get gas and go somewhere where he could use his cell phone to call his parole officer. While he was driving, he saw law enforcement vehicles pass the other direction, and then saw Deputy McLean's vehicle get behind him and its lights activate.

"McDarment parked on a turnout. At this point, he knew he would likely be booked into custody. According to McDarment, by the time he parked his [pickup], Deputy McLean was already out of his vehicle with his gun drawn. McDarment put his hands in front of himself in surrender position and waited for commands.

"Deputy McLean told him to shut off his vehicle and put his hands out the window. Instead, McDarment grabbed his gun and stuck it out the window because he 'knew that's why they were pulling [him] over.' When he did so, he was shot in the back of the neck and twice in the shoulder. McDarment claimed that his gun somehow [accidentally] discharged and struck inside the vehicle somewhere. McDarment thought

6.

the hammer of the gun was pulled back just one 'click' which would apply the safety, a second click would 'unload' the cylinder to allow it to be loaded, and a third 'click' would fire the gun. McDarment claimed not to grab the trigger or hammer, just the handle.

"McDarment denied facing towards the officer the way Lieutenant Wenzinger described. McDarment testified that he was initially knocked unconscious and came to, landing sideways in this truck, looking at the ceiling of the cab. Every time he tried to obey commands to get out and throw the gun out, he would become visible and the officers would fire at him, and he would go back down. Eventually, McDarment deliberately fired two round[s] harmlessly toward the mountains to 'create enough space' so that he could obey the officers' commands. After firing the second round, he was able to get the gun out of the vehicle, open the door, and fall to the ground.

"On cross-examination, McDarment admitted he had three prior serious or violent felony convictions. He acknowledged that his possession of a firearm, possession of ammunition, pointing a gun at [W.J.'s] family members, and his GPS monitor dying were each incidents that could subject him to a parole violation." (*McDarment I*, *supra*, F085045.)

## PROCEDURAL BACKGROUND

On December 14, 2012, an information was filed in the Tulare County Superior Court charging McDarment with counts 1, 3, and 5, attempted murder of, respectively, McLean, Wenzinger, and Hatch (§§ 664, subd. (e)/187, subd. (a)); counts 2, 4, and 6, assault with a firearm on, respectively, McLean, Wenzinger, and Hatch (§ 245, subd. (d)(1)); and other offenses, with firearm enhancements.

It was alleged McDarment had three prior strike convictions (§§ 1170.12, subds. (a)–(j); 667, subds. (b)–(i)), two prior serious felony enhancements (§ 667, subd. (a)(1)), and two prior prison term enhancements (§ 667.5, subd. (b)).

**Convictions**

On August 8, 2022, after a jury trial, McDarment was convicted of counts 1 and 3, premeditated attempted murders of, respectively, McLean and Wenzinger (§§ 664, subd. (a)/187, subd. (a)), and the jury found he committed the offenses on peace officers (§ 664, subd. (e)), he personally and intentionally used a firearm (§ 12022.53, subd. (b)), and he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).

McDarment was also convicted of count 6, assault with a firearm on a peace officer, Hatch (§ 245, subd. (d)(1)), and he personally and intentionally used a firearm (§ 12022.53, subd. (b)) and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); count 7, felon in possession of a firearm (former § 12021, subd. (a)(1)), and count 8, felon in possession of ammunition (former § 12316, subd. (b)).

McDarment was found not guilty of counts 2 and 4, assault with a firearm on, respectively, McClean and Wenzinger, and count 5, attempted murder of Hatch.

The trial court found the prior conviction allegations were true.

**Sentencing**

On September 21, 2022, McDarment was sentenced to an aggregate term of 90 years plus 126 years to life, as follows:  count 1, premeditated attempted murder, 45 years to life plus 20 years for the section 12022.53, subdivision (c) firearm enhancement, and 10 years for the two section 667, subdivision (a)(1) prior serious felony enhancements; on count 3, premeditated attempted murder, a consecutive term of 45 years to life, plus 20 years for the section 12022.53, subdivision (c) firearm enhancement and 10 years for the two section 667, subdivision (a)(1) prior serious felony enhancements; and count 6, assault with a firearm on a peace officer, a consecutive sentence of 36 years to life, plus 20 years for the section 12022.53, subdivision (c) firearm enhancement and 10 years for the two section 667, subdivision (a)(1) prior serious felony enhancements.  The sentences for counts 7 and 8 were stayed under section 654.  (*McDarment I*, *supra*, F085045.)

## McDARMENT'S FIRST APPEAL

In McDarment's direct appeal from the judgment, this court rejected his argument that unanimity instructions should have been given for counts 1, 3, and 6, and affirmed the judgment of conviction.

However, we reversed McDarment's aggregate sentence because there was insufficient evidence that his 2004 assault conviction and his 1996 juvenile adjudication for assault were strikes, and that his 2004 assault conviction was a serious felony within the meaning of the section 667, subdivision (a)(1) enhancement.

We further held that one of the two section 667, subdivision (a)(1) enhancements must be stricken because the two underlying convictions were not brought and tried separately. As to count 6, we held both five-year section 667, subdivision (a)(1) prior serious felony enhancements that were imposed must be stricken because they were not properly alleged, and the abstract of judgment needed to be corrected to reflect the correct presentence custody credits.

We remanded "for a retrial on the prior strike allegations if the People so elect, or for a new sentencing hearing if the People do not go forward on those allegations. Following resentencing, a corrected abstract of judgment, including corrected precustody credits, is to be issued." (*McDarment I*, *supra*, F085045.)[3]

---

[3] We note this court's nonpublished opinion erroneously stated McDarment was challenging his conviction in count 5 for instructional error. The balance of the opinion correctly stated that McDarment was convicted in count 6, and found not guilty in count 5. (*McDarment I*, *supra*, F085045.)

## PROCEEDINGS AFTER REMAND

On May 30, 2025, the trial court conducted a hearing on remand. The prosecution elected not to retry one prior strike conviction and both section 667, subdivision (a) enhancements.

The trial court resentenced McDarment to an aggregate term of 82 years plus 60 years to life as follows: count 1, premeditated attempted murder, 15 years to life doubled to 30 years to life as the second strike term, plus 20 years for the firearm enhancement (§ 12022.53, subd. (c)) and five years for the remaining prior serious felony conviction enhancement (§ 667, subd. (a)); count 3, premeditated attempted murder, 15 years to life doubled to 30 years to life as the second strike term, plus 20 years for the firearm enhancement and five years for the prior serious felony enhancement; count 6, assault with a firearm on a peace officer, the midterm of six years doubled to 12 years as the second strike term, and 20 years for the firearm enhancement. The court stayed the terms for the remaining counts and enhancements and ordered correction of his credits.

On June 26, 2025, McDarment timely filed a notice of appeal from the resentencing hearing.

## DISCUSSION

As noted above, appellate counsel filed a *Wende* brief with this court. The brief also included counsel's declaration that McDarment was advised he could file his own brief with this court. On November 26, 2025, this court advised McDarment by letter that he could file a supplemental letter or brief raising any arguable issues. McDarment did not do so.

After independent review of the record, we find no reasonably arguable factual or legal issues exist.

## DISPOSITION

The judgment is affirmed.

10.